# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NELSON ESTRADA, ALLEN JOO, TIBA PARSA, TIM REYNOLDS, CRAIG BURSON, individually and on behalf of all others similarly situated, | Case No. 1:25-cv-04409-ER |
| Plaintiffs, | |
| v. | |
| TASKUS, INC.; DOES 1-10 | |
| Defendants | |

| | |
|---|---|
| In re Coinbase Customer Data Security Breach Litigation, | Case No. 1:25-md-03153 |

**JOINT *ESTRADA* AND COINBASE PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION TO APPOINT INTERIM CLASS COUNSEL AND OPPOSITION TO MAJORITY PLAINTIFFS' MOTION TO APPOINT INTERIM CLASS COUNSEL**

# TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 1

BACKGROUND ......................................................................................................... 4

I.      EVERYONE ELSE SUES COINBASE IN FEDERAL COURT ...................................... 7

II.     GO AND FNF CONDUCT AN EXTENSIVE INVESTIGATION.................................. 8

III.    THE SKA SLATE ATTEMPTED TO CO-OPT THE CASE AGAINST TASKUS....... 10

IV.    AW JOINS FNF & GO TO PURSUE A JOINT APPOINTMENT IN BOTH
THE MDL AND ESTRADA.................................................................................. 10

PROPOSED LEADERSHIP STRUCTURE ............................................................. 11

ARGUMENT ............................................................................................................. 11

I.      THE WORK THAT THE FNF-AW-GO SLATE HAS ALREADY DONE
BENEFITS THE CASE AGAINST ALL DEFENDANTS AND IS A
DETERMINATIVE FACTOR SUPPORTING ITS APPOINTMENT. ......................... 13

II.     THE CLASS WILL BE PREJUDICED WITHOUT FNF-AW-GO SLATE'S
ACCESS TO THE WHISTLEBLOWER AND OTHER EVIDENCE............................ 15

III.    THE FNF-AW-GO SLATE HAS UNIQUE AND UNMATCHED EXPERIENCE
AND KNOWLEDGE ............................................................................................ 16

        A.    Freedman Normand Friedland................................................................ 16

        B.    Ahdoot Wolfson ...................................................................................... 18

        C.    Greenbaum Olbrantz ............................................................................... 20

IV.    THE FNF-AW-GO SLATE HAS SUFFICIENT RESOURCES TO DEVOTE TO
THIS LITIGATION............................................................................................... 21

V.     THE SKA SLATE SIZE IS UNPRECEDENTED IN A DATA BREACH OF THIS
MAGNITUDE ..................................................................................................... 21

CONCLUSION.......................................................................................................... 22

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Coinbase Inc. v. Bielski,*
  599 U.S. 736 (2023) ............................................................................................ 3

*Deangelis v. Corzine,*
  286 F.R.D. 220 (S.D.N.Y. 2012) ....................................................................... 12

*In re Air Cargo Shipping Servs. Antitrust Litig.,*
  240 F.R.D. 56 (E.D.N.Y. 2006) ................................................................... 13, 14

*In re Deva Concepts Products Liability Litig,*
  2020 U.S. Dist. LEXIS 135046, 2020 WL 4368362 (S.D.N.Y. July 30, 2020) ..................... 21

*In re GEICO Customer Data Breach Litig.,*
  2022 U.S. Dist. LEXIS 255557, 2022 WL 22910573 (E.D.N.Y. Apr. 8, 2022)..................... 15

*In re Parking Heaters Memorandum Antitrust Litig.,*
  310 F.R.D. 54 (E.D.N.Y. 2015) ......................................................................... 21

*In re Shop-Vac Mktg. & Sales Practices Litig.,*
  2013 U.S. Dist. LEXIS 7023 (M.D. Pa. Jan. 17, 2013) ......................................... 14

*In re Stericycle, Inc.,*
  2013 WL 5609328, 2013 U.S. Dist. LEXIS 147718 (N.D. Ill. Oct. 11, 2013)................... 15

*Rubenstein v. Scripps Health,*
  2021 U.S. Dist. LEXIS 192182 (S.D. Cal. Oct. 5, 2021)........................................ 22

*See In re Commodity Futures Litig.,*
  2012 U.S. Dist. LEXIS 23084, 2012 WL 569195 (S.D.N.Y. Feb. 4, 2012)........................ 21

*Sherlip v. Stanley,*
  2025 U.S. Dist. LEXIS 142492, 2025 WL 2097872 (S.D.N.Y. July 25, 2025) .................... 13

*Volkswagen of Am., Inc. v. Sud's of Peoria, Inc.,*
  474 F.3d 966 (7th Cir. 2007)............................................................................ 3

**Other Authorities**

Fed. R. Civ. P. 23, Advisory Committee Notes .......................................................... 13

Fed. R. Civ. P. 23(g) ................................................................................ 1, 2, 11, 12

Manual for Complex Litig., § 10.221 (4th ed. 2004)......................................... 12, 21, 22

Plaintiffs Nelson Estrada, Tim Reynolds, Allen Joo, Tiba Parsa, Craig Burson, Allen Shakib, and Christopher McGuire (the "Joint *Estrada*-MDL Plaintiffs") respectfully submit this memorandum in support of their motion to appoint Greenbaum Olbrantz LLP ("GO"), Freedman Normand Friedland LLP ("FNF"), and Ahdoot & Wolfson PC ("AW") as interim class counsel in both *Estrada v. TaskUs* 25-cv-4099 (S.D.N.Y.) and *In re Coinbase Customer Data Security Breach Litigation*, 25-md-3153 (S.D.N.Y.) (the "MDL") and in response to Majority Plaintiffs' Joint Motion for Appointment of Interim Class Counsel, MDL ECF No. 14 ( the "Scott Kantrowitz Arnold" or "SKA" Slate).

## **INTRODUCTION**

The Court is faced with two competing leadership slates who disagree not only as to who should lead this MDL against Coinbase and the case against TaskUs Inc. ("TaskUs"), but also as to the procedural strategy that will best serve the interests of the class.  On the one hand, the SKA Slate proposes 8 firms to lead the case, supported by an additional 7 firms, who believe that Coinbase, TaskUs and any other potential defendants should all be swept up in the Consolidated MDL Complaint, despite the risk Coinbase may use its status as a party in the MDL to seek a stay as to the entire case or to exercise influence on the discovery process. On the other hand, the FNF-AW-GO Slate proposes a three firm leadership structure to prosecute the Coinbase MDL and the case against TaskUs on a separate, but coordinated track, to avoid such prejudice.  The Court must decide which of the two strategies are in the best interest of the class and which slate is "best able to represent the interests of the class." Fed. R. Civ. P. (23)(g)(1)(A).

FNF, AW, and GO are the firms "best able to represent the interests of the class" because they agree on the best strategy, because they have done the most work "identifying or investigating potential claims," and because they present a contained and efficient group of law firms with extensive experience in both cryptocurrency and data breach class actions and MDLs.  These firms

stand ready to devote additional significant resources to representing the classes.  Fed. R. Civ. P. 23(g).  The Joint *Estrada*-MDL Plaintiffs will provide a streamlined and efficient leadership structure that significantly benefits the class and avoids potential undue prejudice resulting from the potential delay of a consolidated complaint including both defendants.

GO and FNF were the first, and only firms, to identify TaskUs as a defendant.  As reported by Fortune, their recently-filed amended complaint "is the most detailed account yet of one of the biggest crypto hacks of the year and the largest breach that Coinbase has disclosed in its more-than-decade-long history."[1]  Both firms have expended significant efforts to investigate potential claims against both Coinbase and TaskUs, including by working with confidential sources, interviewing ex-employees of TaskUs and other potential defendants, engaging cryptocurrency investigators who can trace funds to the criminals involved, and securing the cooperation of a former employee whistleblower from TaskUs who identifies significant security lapses that resulted in the theft of $400 million in cryptocurrency assets.

Meanwhile, the eight-firm Scott Kantrowitz Arnold ("SKA") Slate (supported by seven additional firms) did not sue TaskUs, admitted five-months-after-the-fact that they "should have," and have expended no significant efforts to investigate claims against Coinbase or TaskUs.  Their proposed strategy of filing a consolidated complaint that usurps the case against TaskUs is not in the best interest of the class.   It ignores the fundamental reality that Coinbase intends to file a motion to compel arbitration and will attempt to delay the resolution of the consolidated complaint while the Court considers the motion. If that motion is successful, the claims against Coinbase will

---

[1] Ben Weiss, *Suspect in Coinbase Hack Kept Data for More Than 10,000 Customers on Her Phone, Court Filing Alleges*, Fortune, Sept. 16, 2025, *available at* https://fortune.com/crypto/2025/09/16/coinbase-hack-taskus-indore-india-ashita-mishra-coinbase-employees.

proceed in arbitration. If Coinbase is unsuccessful, Coinbase will appeal, as they have in the past, to the Supreme Court, and they will seek an automatic stay of proceedings and discovery pending the outcome. *Coinbase Inc. v. Bielski*, 599 U.S. 736 (2023). Coinbase may argue that the entire consolidated complaint should be stayed while arbitrations proceed, prejudicing claims against TaskUs. It may also leverage its status as a party in the case to influence the discovery process. Despite that reality, fifteen firms negotiated a bloated slate that then attempted to co-opt the *Estrada* matter without any advance notice to Estrada's counsel prior to the last hearing. Their position that the MDL consolidated complaint should include all defendants is in their own best interest, but not in the best interest of the class.

In contrast, a joint appointment of FNF, AW, and GO in both actions would resolve any concerns about coordination between the two actions without carrying the same risks for the class because these firms agree that the complaints should proceed on a separate but coordinated track. This group has engaged in productive meet and confers with both Coinbase and TaskUs concerning how to coordinate both actions if they are appointed class counsel in both cases and will finalize such efforts once interim class counsel is appointed.

AW's decision to join the team solidifies a group of counsel with the best experience and expertise to represent the class in both the Coinbase MDL and *Estrada* matters. AW was one of the first firms to file an action against Coinbase and the sole firm that initiated the MDL proceedings. AW also has unparalleled experience in MDL and class action data breach litigation and significant resources to contribute to prosecution of these actions.

FNF, AW, and GO have substantial experience in handling class actions involving cryptocurrency and data breaches, extensive knowledge of the applicable law, and significant resources to commit to representing the class. FNF has extensive experience with litigation

involving cryptocurrency, while the SKA slate does not appear to highlight any cryptocurrency experience in their application. AW has been at the forefront of the largest data breach litigation cases, has led or co-led litigation in countless multi-district and consolidated litigations, and has recovered billions on behalf of claimants. And GO provides deep on-the-ground connections to cryptocurrency investigators and fact witnesses, and a wealth of experience litigating some of the nation's largest complex civil cases and class actions for nearly a decade at Paul, Weiss, Rifkind, Wharton & Garrison LLP. The efficient combination of each firm's particular experience will provide substantial benefits to the class.

While efficient, the FNF-AW-GO Slate seeks authority to assign work to any firm who has cases in this MDL, in the event additional boots are needed on the ground. With almost thirty years of experience co-counseling amicably with almost every firm on the competing slate, Ms. Wolfson is intimately familiar with each firm's unique talents and who is best fitted for particular tasks. The FNF-AW-GO Slate will stay lean and flexible, ready to work inclusively and efficiently with others when the case demands so, such as vetting all potential class representatives for the consolidated complaint against Coinbase.

Meanwhile, the SKA Slate's unwieldy structure is directly contrary to authority requiring substantial justifications for a four-firm executive committee and liaison counsel. Supported by seven additional firms, this Slate is likely to assign work to its supporters, excluding the firms who have done the most work thus far on behalf of the class regarding TaskUs. Unencumbered by promises to numerous supporters, and in agreement on the most efficient way to prosecute these parallel cases, the FNF-AW-GO Slate is superior to represent the best interests of the class.

## **BACKGROUND**

The SKA Slate's lack of investigation is apparent from its cursory recitation of the facts in its application, which was essentially limited to the publicly available fact that Coinbase

announced that an unnamed threat actor claimed to have obtained the sensitive personally identifiable information of more than 60,000 Coinbase customers by bribing and recruiting a small number of allegedly "rogue" overseas customer support agents to steal Coinbase data (the "Data Breach"), and that this was discovered when the criminal demanded a $20 million ransom.

A thorough and ongoing investigation by the FNF-AW-GO Slate tells a far more developed story.[2]  Since as early as 2019, Coinbase has outsourced its customer service to offshore business process outsourcing companies ("BPOs") like TaskUs, a multi-billion-dollar BPO now owned by Blackstone.  *See* Am. Compl. ¶ 28.  The average salary for an entry level TaskUs employee in India ranges from approximately $4,000 to $6,000 per year, compared to approximately $43,000 per year in the United States. *Id.* Given their low wages, TaskUs has known for years that its employees are vulnerable to bribery schemes in exchange for access to their customers' PII. *Id.* ¶ 70, 71, 86.  In 2022, for example, TaskUs was sued in a class action after certain allegedly "rogue" TaskUs employees leaked customer information belonging to a different cryptocurrency company. *Id.* ¶ 71.  And TaskUs has repeatedly warned investors that "we have experienced, and in the future, we may again experience, data security incidents resulting from … employee misconduct."  *Id.* ¶ 109.

The FNF-AW-GO Slate's investigation revealed that TaskUs did not learn from its prior mistakes.  According to a whistleblower with personal knowledge of the Data Breach, as early as September 2024, TaskUs employees joined a criminal conspiracy to steal highly sensitive personally identifiable information belonging to Coinbase users including names, addresses, phone numbers, email addresses, social security numbers, bank account numbers, bank account

---

[2] These facts are drawn from the Amended Complaint filed in the *Estrada* action on September 16, 2025. *See* First Amended Complaint, *Estrada*, 25-cv-04409 (S.D.N.Y. Sept. 16, 2025), ECF No. 31) (hereinafter "Am. Compl.")

identifiers, government-ID images, and account data (collectively, "PII"). *Id.* ¶ 33. TaskUs employees stole that PII by taking pictures of TaskUs computers displaying such PII and transmitting those pictures to other criminals at the center of the conspiracy in exchange for approximately $200 per picture, a hefty sum relative to those employees' low wages at TaskUs. *Id.* ¶ 33—36.

The volume of data exposed through the theft was staggering. By the time investigators identified one criminal TaskUs employee in early January 2025, TaskUs determined that a single employee's phone contained data belonging to more than 10,000 Coinbase customers. *Id.* That employee was one of potentially dozens, if not hundreds, of criminal TaskUs employees who exfiltrated Coinbase customer data from TaskUs computers. *Id.*

In January 2025, TaskUs convened a team of human resources personnel to investigate the Data Breach. That team interviewed employees, reviewed certain employees' cellular devices, which included pictures with Coinbase customers' PII and communications about the conspiracy, and worked with a cross section of other employees to investigate the Data Breach. *Id.* ¶ 37-43. According to at least one former TaskUs employee, the conspiracy so pervasively infiltrated TaskUs' processes that TaskUs and its investigators in the human resources department could not identify all the individuals involved. *Id.* As a result, TaskUs terminated all employees at the two facilities in India providing services to Coinbase—as many as 300 employees according to some reports. *Id.*

After completing its investigation of the Data Breach, TaskUs took steps to silence those with knowledge of it. On February 10, 2025, TaskUs suddenly terminated every human resources team member charged with investigating the Coinbase Data Breach. *Id.* ¶ 42. TaskUs has refused to provide those employees with information substantiating the basis for their terminations. *Id.* In

its February 2025 SEC filings, TaskUs then reported that it was not aware of any material data breaches affecting its business. *Id.* ¶ 43.

GO and FNF have identified numerous security flaws and shortcomings in TaskUs' processes that led to this breach. For example, even though TaskUs implemented a policy forbidding employees from possessing personal electronic devices on work premises, TaskUs failed to enforce that policy, allowing numerous employees to use them to take hundreds of pictures—daily—of TaskUs computers. *Id.* ¶ 31. TaskUs also failed to implement any standard security measures such as key logging to supervise employees who downloaded or viewed Coinbase customers' PII in large batches. *Id.* ¶ 32. GO and FNF have identified other cryptocurrency companies targeted by these criminals that implemented such measures and thus avoided any data breach. *Id.* ¶ 57.

The results of TaskUs and Coinbase's failures and their resulting coverup have been staggering. Coinbase estimates that its customers have lost up to $400 million to criminals working with—and in some cases, for—TaskUs. *Estrada's* named Plaintiffs have, collectively, lost millions of dollars in cryptocurrency assets, including losses incurred between the time when TaskUs identified the Data Breach (but failed to inform customers) and when the Data Breach was finally announced in May 2025.

### I.    EVERYONE ELSE SUES COINBASE IN FEDERAL COURT

On May 15, 2025, the first of several Plaintiffs filed generic and largely identical complaints against Coinbase that contained little information about the alleged breach.[3] On May 19, 2025, Tina Wolfson of AW filed a motion to transfer and centralize eleven largely identical

---

[3] *See, e.g. Belian v. Coinbase Global, Inc. et al*, No. 3:25-cv-04171; *Ortiz v. Coinbase, Inc.* No. 4:25-cv-04235, *Neu et al v. Coinbase Global Inc., et al*, No. 3:25-cv-04243.

claims against Coinbase with the Judicial Panel on Multidistrict Litigation.  Several other law firms continued to file nearly identical lawsuits against Coinbase in the days that followed.

## II.    GO AND FNF CONDUCT AN EXTENSIVE INVESTIGATION

Meanwhile, on May 17, 2025, Carter Greenbaum, of GO, began investigating potential claims against Coinbase and other defendants related to the breach.  Greenbaum engaged a confidential investigator.  *See* Declaration of Carter Greenbaum ("Greenbaum Decl.") ⁋ 9.  Based on a fast-paced but thorough investigation that included interviews, review of certain filings, analysis of various cryptocurrency wallets, and other research, Greenbaum and his team identified TaskUs as a source of the Data Breach. Greenbaum Decl. ⁋ 10.

On May 27, 2025, Greenbaum was the first (and only counsel) to file suit against TaskUs in the *Estrada* matter.  At that time, not a single public report identified TaskUs as the source of the Data Breach.  The inclusion of TaskUs as the only defendant in *Estrada* "reflected a conscious decision."  Sep't 9, 2025 Hr'g Tr. 10:22-23.  In the days after filing, numerous press outlets reported on the allegations in the *Estrada* matter concerning TaskUs' involvement.  Greenbaum Decl. ⁋ 7.  In response to press inquiries regarding Greenbaum's suit, TaskUs confirmed that it had "identified two individuals who illegally accessed information from one of our clients . . . We immediately reported this activity to the client, terminated the individuals involved, and are coordinating with law enforcement."[4]

Not a single other Plaintiff or law firm named TaskUs as a defendant in any of the numerous related matters consolidated in the MDL, including those filed after May 27, 2025.

---

[4] New York Law Journal, *Coinbase User Blames Contractor TaskUs for $400 Million Cyberattack*, (May 28, 2025), available at
https://www.law.com/newyorklawjournal/2025/05/28/coinbase-user-blames-contractor-taskus-for-400-million-cyberattack/?slreturn=20250918105909

GO partnered with a highly experienced national law firm with substantial resources, FNF, to continue to investigate (and litigate) claims against TaskUs and other potential defendants, expending hundreds of hours and significant resources in doing so. Greenbaum Decl. ¶ 11. Those investigatory steps included, but are not limited to:

- Communicating with numerous witnesses, including employees of defendants or potential defendants;

- Interviewing a whistleblower and ex-employee of TaskUs on numerous occasions spanning several hours and securing their cooperation to be deposed on matters relevant to the Data Breach;

- Engaging in numerous discussions with industry professionals with relevant knowledge of the Data Breach;

- Engaging private investigators to assist in counsel's investigations of potential claims;

- Interviewing numerous potential clients and evaluating their claims against Defendants and potential defendants;

- Identifying certain repositories of documents and other relevant information in possession of Defendants that will be useful in the discovery phase of litigation.

- Reviewing thousands of pages of documents pertinent to the investigation

- Analyzing publicly available data and securities filings for insights related to the Data Breach

Greenbaum Decl. ¶ 11.

As a result, FNF and GO have identified other potential defendants, along with TaskUs. One of FNF and GO's clients has sent notice letters to several potential defendants under the California Consumer Privacy Act (CCPA). Greenbaum Decl. ¶ 12. Currently, those potential defendants remain unnamed as GO and FNF continue their investigation. Yet FNF and GO are uniquely positioned to seek discovery from those parties to confirm and/or understand their involvement in the Data Breach.

Based on its thorough (and ongoing) investigation, FNF and GO have filed an amended complaint against TaskUs providing significant and unmatched insight into the Data Breach. By contrast, the SKA Slate's "investigation" includes simply reviewing publicly available information.

## III.    THE SKA SLATE ATTEMPTED TO CO-OPT THE CASE AGAINST TASKUS

On August 7, 2025, the Judicial Panel on Multidistrict Litigation established a multidistrict litigation in the Southern District of New York for cases against Coinbase related to the Data Breach. *See Estrada* ECF No. 19. The Panel, however, did not order coordination or consolidation of the *Estrada* action in the MDL, leaving the issue to this Court. *Id.* On August 26, 2025, Coinbase sought to coordinate the *Estrada* action within the MDL. *See Estrada* ECF No. 23. Both TaskUs and Estrada filed oppositions, which the Court heard at a conference on September 9, 2025. *See Estrada* ECF No. 28, 32.

Without initiating any prior meet and confer efforts with the firms who have been diligently prosecuting the case against TaskUs for months, the SKA Slate informed GO for the first time minutes before the September 9th hearing that they would support Coinbase's motion to include the TaskUs case in the MDL. At the hearing, the SKA Slate informed the Court and *Estrada's* counsel, for the first time "I think we should have reached out to Mr. Greenbaum earlier with respect to including him in our leadership structure. We think TaskUs should be one of the defendants included in the consolidated amended complaint." Sept. 9, Hr'g. Tr. 18:6-9. Thereafter, the competing slates engaged in discussions about leadership and strategy, but could not come to agreement on either.

## IV.    AW JOINS FNF & GO TO PURSUE A JOINT APPOINTMENT IN BOTH THE MDL AND *ESTRADA*

Thereafter, Tina Wolfson at AW, one of the nation's leading data breach litigators behind numerous historic class actions, joined FNF and GO to pursue a coordinated and streamlined slate

that would lead both the MDL and *Estrada* actions with a procedural strategy that is in the best interest of the class.  GO, FNF, and AW again met and conferred with the SKA Slate regarding strategy and a compromise on leadership, but again there was no agreement as to either.

## PROPOSED LEADERSHIP STRUCTURE

FNF, AW, and GO propose a leadership structure in which the three firms are co-lead counsel, without a need for any executive committee or liaison counsel.  The three firms seek authority to assign work to any firm with a case in this MDL on an as-needed basis, subject to a billing protocol that will avoid duplication of effort and compensation for unauthorized work.  This slate agrees on the strategy of having parallel, coordinated, but unconsolidated cases against Coinbase on the one hand and TaskUs, and the other vendors on the other.  Coinbase, TaskUs, and Estrada have engaged in fruitful discussions concerning how to coordinate the two cases, but the parties agree that they must await the Court's order on this Motion to Appoint Class Counsel to finalize these efforts.

## ARGUMENT

Federal Rule of Civil Procedure 23 permits the Court to "designate interim counsel to act on behalf of a putative class before determining whether to certify the action as a class action." Fed. R. Civ. P. 23(g)(3).  Rule 23(g)(1)(A) sets out the factors for the Court to consider when appointing interim class counsel, which is the same criteria courts use to select potential counsel for a certified class.  *Deangelis v. Corzine*, 286 F.R.D. 220, 223 (S.D.N.Y. 2012).  These factors are:

> (i) the work counsel has done in identifying or investigating potential claims in the action;
>
> (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;
>
> (iii) counsel's knowledge of the applicable law; and

(iv) the resources counsel will commit to representing the class.

Fed. R. Cin. P. (23)(g)(1)(A); *Deangelis*, 286 F.R.D. at 223.  Appointed "counsel must fairly and adequately represent the interests of the class," and, in addition to the factors above, the Court may "consider any other matter pertinent to counsel's ability to" do so. Fed. R. Civ. P. 23(g)(1)(B); Fed. R. Civ. P. 23(g)(4).

Similarly, the Manual for Complex Litigation provides that courts should "ensure that counsel appointed to leading roles are qualified and responsible, that they will fairly and adequately represent all of the parties on their side, and that their charges will be reasonable." Manual for Complex Lit., § 10.22 (4th ed. 2004). "Counsel designated by the court also assume a responsibility to the court and an obligation to act fairly, efficiently, and economically in the interests of all parties and parties' counsel." *Id.*

"If more than one adequate applicant seeks appointment, the court must appoint the applicant best able to represent the interests of the class." Fed. R. Civ. P. 23(g)(2). "The most important [factor] is achieving efficiency and economy without jeopardizing fairness to the parties." Manual for Complex Lit., § 10.221 (4th ed. 2004).

The SKA Slate argues that courts encourage a "private ordering" approach "wherein counsel jointly agree on a leadership structure and present their recommendation for appointment to the Court."  Guglielmo Motion, MDL ECF No. 14-1, at 6.  But here there is no universal consensus, and two competing groups have "privately ordered" themselves, so the Court must decide which group is "best able to represent the interest of the class."  Fed. R. Civ. P. 23(g)(2). Appointment of counsel "is not supposed to be a popularity contest, and the number of attorneys supporting a given candidacy is not included among the factors set forth in Rule 23(g)." *In re Air Cargo Shipping Servs. Antitrust Litig.*, 240 F.R.D. 56, 58 (E.D.N.Y. 2006).  Indeed, "voluntary agreements among lawyers may create cartel-like groupings that favor some lawyers and disfavor

others. . . ." *In re Third Cir. Task Force on the Selection of Class Counsel*, 208 F.R.D. 340, 348 (3d Cir. 2002).

The FNF-AW-GO Slate is best able to represent the best interests of the class. It has adopted the better procedural strategy, provides unparalleled experience in handling cryptocurrency cases and class action data breach matters, has undertaken a robust and far more substantial investigation, and will commit significant resources. Their streamlined leadership team will also provide important efficiencies and benefits to the class. Especially of note, GO's identification of a whistleblower, who has expressed a willingness to provide critical testimony, is a substantial factor supporting the appointment of the FNF-AW-GO Slate as Interim Class Counsel. Without access to their investigation and whistleblower testimony, the Class will be significantly prejudiced and hampered in its ability to obtain relief.

I.    **THE WORK THAT THE FNF-AW-GO SLATE HAS ALREADY DONE BENEFITS THE CASE AGAINST ALL DEFENDANTS AND IS A DETERMINATIVE FACTOR SUPPORTING ITS APPOINTMENT.**

Federal courts give significant weight to counsel who have performed considerable work in identifying and investigating potential claims and have opted to appoint a slate of attorneys whose complaint demonstrates more "extensive analysis" of the relevant facts. *See Sherlip v. Stanley*, 2025 U.S. Dist. LEXIS 142492, 2025 WL 2097872 (S.D.N.Y. July 25, 2025). The Advisory Committee Notes to Rule 23 also explain that "[t]he fact that a given attorney filed the instant action, for example, might not weigh heavily in the decision [to appoint them] if that lawyer had not done significant work identifying or investigating claims." Fed. R. Civ. P. 23, Advisory Committee Notes.

Federal courts often appoint the interim class counsel slate performing more significant investigative work. *See In re Shop-Vac Mktg. & Sales Practices Litig.,* 2013 U.S. Dist. LEXIS 7023, at *10 (M.D. Pa. Jan. 17, 2013) (appointing class counsel to the group that has "satisfied the

Court that it has conducted more significant workin investigating and identifying potential claims."). In *In re Air Cargo Shipping Servs. Antitrust Litigation*, the Eastern District of New York explained that if it were to appoint one set of firms to the exclusion of the firms that "ha[ve] clearly been able to accomplish the most thus far in investigating the claims in this action . . . [t]he fruit of those efforts would largely be lost," a result which the Court determined should be avoided. *In re Air Cargo Shipping Servs. Antitrust Litig.* 240 F.R.D at 58.

The FNF-AW-GO Slate's investigation of potential claims in this matter is unmatched and merits appointment as Class Counsel. They were the first to identify TaskUs as a defendant. If not for their investigation, TaskUs may not have been publicly identified at all. They have also identified other potentially responsible parties and are prepared—with AW—to take steps to hold those parties responsible. They have secured the cooperation of key whistleblower testimony from a former TaskUs employee who identifies serious security flaws. Their investigators can trace payments to and from criminal actors at the center of the conspiracy. These uncovered facts benefit the case against all defendants, including Coinbase. And they have identified named Plaintiffs who lost significant amounts of cryptocurrency because of the Data Breach (in contrast to the SKA Slate named Plaintiffs who merely received the May 14, 2025 Coinbase notice).

Meanwhile, the SKA Slate has done none of these things. As with many data breach class actions, the SKA Slate's filings "were not precipitated or dominantly developed through independent investigation but rather appear to have been largely precipitated by [Coinbase's May 14, 2025] notice." *In re GEICO Customer Data Breach Litig.*, 2022 U.S. Dist. LEXIS 255557, 2022 WL 22910573 at *9 (E.D.N.Y. Apr. 8, 2022) (citations and internal quotations omitted). Each of their complaints parrots the other. Their Motion does not identify any independent investigation by the 15 firms supporting the SKA Slate.

The FNF-AW-GO Slate have also contributed far more significant resources to this litigation than the 15 firms supporting the SKA Slate.  In the *Estrada* action, FNF and GO have filed the initial complaint, litigated TaskUs' Motion for Leave to File a Motion to Dismiss, participated in a conference with the Court concerning the Motion, opposed inclusion of the *Estrada* action in the MDL, and have now filed a robust amended complaint.  Fortune called the amended complaint the ""is the most detailed account yet of one of the biggest crypto hacks of the year and the largest breach that Coinbase has disclosed in its more-than-decade-long history."[5] AW, meanwhile, initiated the MDL proceedings, met and conferred with Coinbase and other plaintiffs to coordinate and minimize proceedings, and has participated in oral argument at the Judicial Panel on Multidistrict Litigation.

## II.   THE CLASS WILL BE PREJUDICED WITHOUT FNF-AW-GO SLATE'S ACCESS TO THE WHISTLEBLOWER AND OTHER EVIDENCE

FNF-AW-GO Slate's access to an ex-employee of TaskUs willing to cooperate in their investigation provides the class with vital information necessary for the prosecution of claims against TaskUs (and potentially Coinbase if such claims proceed beyond the pleading stage).  The whistleblower was a key employee of TaskUs charged with investigating the Data Breach.  In *In re Stericycle, Inc.*, the district court notably recognized that appointment of one firm was appropriate "[b]ecause of its access to [a] whistleblower's perspective and the sharing of information with her *quit tam* counsel."   2013 WL 5609328, 2013 U.S. Dist. LEXIS 147718 (N.D. Ill. Oct. 11, 2013).  This Slate is in the process of negotiating the terms pursuant to which TaskUs

---

[5] Ben Weiss, *Suspect in Coinbase Hack Kept Data for More Than 10,000 Customers on Her Phone, Court Filing Alleges*, Fortune, Sept. 16, 2025, *available at* https://fortune.com/crypto/2025/09/16/coinbase-hack-taskus-indore-india-ashita-mishra-coinbase-employees.

would agree to proceed with a deposition of that whistleblower prior to a Rule 26(f) conference to preserve their testimony for trial. Immediate appointment of this Slate is therefore imperative.

## III. THE FNF-AW-GO SLATE HAS UNIQUE AND UNMATCHED EXPERIENCE AND KNOWLEDGE

Next, the FNF-AW-GO Slate has significant experience "handling class actions, other complex litigation," and perhaps most importantly, "the types of claims asserted in the action."

### A. Freedman Normand Friedland

FNF has extensive experience litigating cryptocurrency actions and class actions. FNF's team includes Devin (Velvel) Freedman, Ted Normand, Joseph Delich, Jordana Haviv, and Niraj Thakker. A firm resume appears as **Exhibit A.**

Velvel Freedman is a founding partner of Freedman Normand Friedland. Mr. Freedman currently represents a putative class of data breach victims who purchased Ledger devices—a type of cryptocurrency wallet—in claims against defendants that include TaskUs. *Baton v. Ledger SAS*, No. 3:21-cv-02470 (N.D. Cal.). In 2021, Mr. Freedman led a month-long federal cryptocurrency jury trial, securing a $140 million judgment. *Kleiman v. Wright,* No. 18-CV-80176 (S.D. Fla. Sept. 21, 2020). Mr. Freedman also currently represents a putative class of financial aid recipients at nationally recognized universities allegedly injured by antitrust violations by the so called "568 Presidents Group", which has already resulted in over $300 million in settlements. *Henry v. Brown University*, No. 1:22-cv-00125 (N.D. Ill.). He has also been lead defense counsel in multiple class actions and class arbitrations. *See e.g.*, *Joe Rudy Reyes, et al. v. JPay, Inc. et al.*, 2:18-cv-00315-R-MRW (C.D. Cal.); *Rodriguez et. al. v. JPay Inc., et. al.,* 2:19-cv-14137 (S.D. Fla.); *In the Matter of the Arbitration Between Shalanda Houston and Cynthia Kobel, individually and on behalf of all others similarly situated and JPay, Inc,* AAA Case No. 01-15-0005-3477 (American Arbitration Association); *In the Matter of the Arbitration Between Oumer Salim, individually and*

*on behalf of all others similarly situated and JPay, Inc.,* AAA Case No. 01-15-0005-8277 (American Arbitration Association).

Edward Normand is also a founding partner of Freedman Normand Friedland. In addition to working on many of the firm's antitrust and other class actions (including the 568 class action described above), Mr. Normand represented both plaintiffs and defendants in class action, securities, and antitrust matters at Boies Schiller Flexner LLP for more than two decades. For example, Mr. Normand represented Vanguard in an opt-out from the recent securities class action against ARCP, *In re American Realty Capital Props., Inc. Litig.*, 1:15-mc-00040- AKH (S.D.N.Y.); represented a class of employee health benefit plans in an ERISA action against Merck-Medco arising out of the management of pharmaceutical benefits, *C. States Southeast v. Merck-Medco,* 7:03-md-01508 (S.D.N.Y.); and represented EchoStar in connection with its efforts to obtain FCC approval under the antitrust laws to acquire DirecTV.

Joseph Delich is a partner at Freedman Normand Friedland. Mr. Delich also represents the putative class in the successful *Henry* antitrust class action over the 568 Presidents Group, and was part of the trial team in the *Kleiman* action. Mr. Delich is also currently lead trial counsel in a multimillion dollar promissory estoppel action against NASCAR on behalf of a race team's cryptocurrency sponsor. *LETSGOBRANDON.COM FOUNDATION v. NASCAR*, No. 23-002831 CA 01 (44) (Fla. Cir. Ct.).

Jordana Haviv is a partner at Freedman Normand Friedland. Ms. Haviv is an experienced litigator with expertise in complex commercial, white collar, employment and securities litigation; internal investigations; and international arbitration. At Paul, Weiss, she served as counsel to the National Football League in its landmark concussion litigation class action settlement and related cases. At FNF, Ms. Haviv co-led a mass arbitration of approximately 75 claimants whose

cryptocurrency retirement savings were stolen by a hacker. She also is litigating a dispute involving the issuance of tokens in Delaware Chancery Court.

Niraj Thakker is an associate at Freedman Normand Friedland. Mr. Thakker has extensive experience both defending and prosecuting class actions. Given that much of the relevant events occurred in India, Mr. Thakker is also proficient in multiple languages that will add significant value for the class and enhance the FNF-AW-GO Slate's ability to effectively and efficiently prosecute this case. Specifically, Mr. Thakker can read, write, and speak both Hindi and Marathi, and is also fluent in Gujurati and Kutchi.

**B.    Ahdoot Wolfson**

Tina Wolfson will lead this litigation on behalf of Ahdoot Wolfson and will utilize a team of associates from her 15-person firm as necessary. Ms. Wolfson is one of only a handful of female founding partners of a nationwide class action firm. Six years after arriving in the United States as a political refugee from the former Soviet Union, Ms. Wolfson attended Columbia University and then Harvard Law School (class of 1994), graduating both *cum laude*. Four years later, she co-founded AW, and she has spent the nearly 30 years since representing consumers in a wide range of class action litigation, including MDL's and consolidated complex class actions.

Ms. Wolfson has litigated countless data breach cases and has a deep understanding of the many substantive and technical issues that arise, including vetting and pleading the best class representatives and causes of action, briefing and arguing motions to dismiss, efficiently pursuing seminal discovery that involves highly technical factual issues and evidentiary privilege issues, taking effective depositions, including of information security officers and technical and damages experts, working with forensic consultants and experts to develop the class damage models, and briefing and arguing *Daubert*, class certification, and summary judgment motions. Ms. Wolfson also has won numerous issues of first impression at the trial and appellate levels in data privacy actions. For example, in *Remijas v. Neiman Marcus Grp., LLC*, 794 F.3d 688 (7th

Cir. 2015), AW single-handedly won the seminal appellate opinion on Article III standing based on imminent future harm.

Ms. Wolfson has led numerous cases to successful results, securing justice for millions of class members, obtaining billions of dollars in relief for victims, and driving meaningful change in corporate conduct, including in data breach and data privacy class actions. *See* **Ex. B** (Wolfson Resume). Here is a sample of consumer privacy results:

- ***Experian Data Breach Litig.,*** No. 8:15-cv-01592-AG-DFM (C.D. Cal.) (Hon. Andrew J. Guilford) - $150 million settlement for a data breach affecting nearly 15 million class members.

- ***In re LoanDepot Data Breach Litigation,*** No. 8:24-cv-00136 (C.D. Cal.) (Hon David O. Carter) - $98.5 million settlement for 17 million class members.

- ***Premera Blue Cross Customer Data Sec. Breach Litig.,*** No. 3:15-cv-2633-SI (D. Or.) (Hon. Michael H. Simon) - $74 million settlement for a data breach which disclosed the personal and medical information of 11 million class members plus robust injunctive relief overhauling cybersecurity practices.

- ***U.S. Office of Personnel Management Data Security Breach Litig.,*** No. 1:15-mc-1394-ABJ (D.D.C.) (Hon. Amy Berman Jackson) - $63 million settlement for class members affected by the data breach case, following a successful appeal to the D.C. Circuit.

- ***Anaya, et al. v. Concore, Inc., et al.***, No. 24-2961 (E.D. Pa.) (Rufe, J.): preliminarily approved $40 million common fund data breach settlement in medical information hub-and-spoke-like data breach involving Cencora f/k/a AmerisourceBergen and numerous of its pharmaceutical company customers.

- ***In re Ambry Genetics Data Breach Litig.,*** No. 8:20-cv-00791 (C.D. Cal.) (Hon. Cormac J. Carney) - data breach settlement valued at over $20 million for the benefit of only 225,000 class members.

- ***Google Location History Litigation,*** No. 5:18-cv-5062 (N.D. Cal.) (Hon. Edward J. Davila) - $64 million settlement in a case stemming from Google's unlawful collection and use of mobile device location information on Android and iPhone devices.

- ***Rivera v. Google LLC***, No. 2019-CH-00990 (Ill. Cir. Ct.) (Hon. Ann M. Loftus) - $100 million for Illinois consumers and overhauling of Google's biometric privacy practices related to Google Photos.

- ***Zoom Video Commc'ns, Inc. Privacy Litigation***, No. 20-cv-02155 (N.D. Cal.) (Hon. Lucy J. Koh and Hon. Laurel Beeler) - $85 million plus robust injunctive relief overhauling Zoom's data collection and security practices.

Ahdoot Wolfson's current leadership positions in data breach privacy class actions include class actions include *Episource*, *Snowflake*, *AMCA*, *Perry Johnson* (hub and spoke data breach cases), *Inmarket Media, Apple Privacy* and *Allstate* (data tracking). (Exhibit B).

**C.    Greenbaum Olbrantz**

GO has substantial experience handling class actions and complex civil litigation. A summary of that experience can be found in the appended Declaration of Carter Greenbaum.

At Paul, Weiss, Greenbaum co-led the prosecution of the largest government takings claim ($40 billion) against the United States Government in history. He was instrumental in the successful prosecution of a billion-dollar international arbitration, arguing and prevailing on key pre-trial motions that set the stage for a successful eve-of-hearing settlement. He orchestrated the successful public settlement (and dismissal) of a $400 million derivative action and other claims through coordinated efforts in related bankruptcy proceedings. He was part of the lead team defending the Independent Directors of the Board of Directors of CBS in a historic shareholder class action involving dozens of different law firms and numerous related proceedings. He represented Google in the Department of Justice's antitrust case involving Google's advertising technology business. He was the lead associate at trial in *Bandera Master Fund v. Boardwalk Pipeline Partners, LP*, which awarded the largest class damages amount in Delaware's history, and part of the team that successfully overturned that verdict at the Delaware Supreme Court.

Since leaving Paul, Weiss and launching GO just a few months ago, Greenbaum's class actions have been covered by the New York Times, Washington Post, Reuters, Good Morning America, ABC, NBC, Bloomberg, Fortune, Law360 and syndicated internationally through the Associated Press.

## IV.    THE FNF-AW-GO SLATE HAS SUFFICIENT RESOURCES TO DEVOTE TO THIS LITIGATION

The FNF-AW-GO Slate fully understands the financial and human resources this case will require and would not be applying to lead this case if the firms were not willing to expend them. This slate has already contributed substantial resources to the litigation, including through their robust investigation, engagement of potential experts and investigators, and ongoing litigation efforts.  The slate stands ready, willing, and able to prosecute the case speedily and efficiently.

## V.    THE SKA SLATE SIZE IS UNPRECEDENTED IN A DATA BREACH OF THIS MAGNITUDE

By contrast, the eight-law firm SKA Slate and additional seven supporting law firms on top of that, have not achieved any significant investigation.  It is inherently unwieldy and rife with potential for duplication of work and billing the class for process over substance.

"[Steering] Committees are most commonly needed when group members' interests and positions are sufficiently dissimilar to justify giving them representation in decision making." Manual for Complex Litig., § 10.221 (4th ed. 2004). Yet, the SKA Slate does not identify any dissimilarities in the proposed Class.  Courts in this district have routinely rejected such committees as resulting in unnecessary costs and inefficiencies.  *See In re Commodity Futures Litig.,* 2012 U.S. Dist. LEXIS 23084, 2012 WL 569195, at \*2 (S.D.N.Y. Feb. 4, 2012) ("[C]ommittees of counsel can lead to substantially increased costs and unnecessary duplication of efforts. At this preliminary stage of the litigation, ... a leadership structure consisting of two co-lead counsel will be sufficient to address the various complexities that may arise, while keeping unnecessary costs to a minimum.")*; see also In re Deva Concepts Products Liability Litig,* 2020 U.S. Dist. LEXIS 135046, 2020 WL 4368362, at \*4 (S.D.N.Y. July 30, 2020) (commending counsel for eliminating formal executive committee); *In re Parking Heaters Memorandum*

*Antitrust Litig.,* 310 F.R.D. 54, 58 (E.D.N.Y. 2015) (appointing two firms as co-lead counsel and noting "the inevitable redundancies and inefficiencies attendant to a four-firm leadership structure").  In *Gerber v. Twitter*, *Inc.* Case No. 4:2023-cv-0186 (N.D. Cal) Mr. Guglielmo of Scott+Scott and Israel David of Israel David LLC, sought their appointment as co-lead counsel with a two-firm steering committee to prosecute a data breach involving 200 million Twitter users. In that case, the Court expressed hesitation as to the need for any steering committee and counsel withdrew the request, leaving just two co-lead counsel to pursue Twitter in a 200 million user data breach class action.  *See Gerber,* ECF Nos. 37, 38, 39, 42. Here, by contrast, Mr. Guglielmo proposes three co-lead firms with a four-firm steering committee and liaison counsel to pursue Coinbase for a breach allegedly involving 70,000 users—a fraction of those involved in Twitter.

Neither is the SKA Slates's proposed liaison counsel necessary for the efficient prosecution of this litigation.  "Liaison counsel generally assists lead counsel with administrative matters, such as filings, communications with the court and other counsel, convening meetings of counsel, assuring compliance with local rules, and attending hearings. *See Walker*, 2011 U.S. Dist. LEXIS 58803, 2011 WL 2160889, at *5 (N.D. Ill. May 26, 2011); *see also* Manual for Complex Litig., § 10.221 (4th ed. 2004). All three proposed firms on FNF-AW-GO Slate are licensed in and have presence in New York and can well cover these tasks.  *See Rubenstein v. Scripps Health*, 2021 U.S. Dist. LEXIS 192182, at *16 (S.D. Cal. Oct. 5, 2021) (denying liaison counsel).

## CONCLUSION

The FNF-AW-GO Slate has devoted significant resources toward a comprehensive investigation of claims at issue in this litigation, unmatched by the competing slate.  They agree on a superior procedural strategy and have the experience, knowledge, and resources to best

represent the class effectively and efficiently.  Pursuant to Rule 23(g), they request appointment

of their firms as class counsel in both the MDL and *Estrada* actions.

Dated: September 18, 2025                Respectfully Submitted,

/s/ Carter E. Greenbaum
Carter E. Greenbaum
Casey Olbrantz
**GREENBAUM OLBRANTZ LLP**
255 5th Avenue, Suite C221
New York, New York 10019
Tel: 212-732-6837
Email: carter@greenbaumolbrantz.com
Email: casey@greenbaumolbrantz.com

Devin ("Vel") Freedman
Niraj Thakker (pro hac vice forthcoming)
**FREEDMAN NORMAND FRIEDLAND LLP**
1 SE 3rd Ave, Suite 1240
Miami, FL 33131
Tel: 788-924-2900
Email: Vel@fnf.law

Edward Normand
Joseph Delich
Jordana Haviv
**FREEDMAN NORMAND FRIEDLAND LLP**
155 E. 44th St., Suite 915
New York, NY 10017
Tel: 646-494-2900
Email: tnormand@fnf.law
Email: jdelich@fnf.law
Email : jhaviv@fnf.law

Tina Wolfson
**AHDOOT & WOLFSON, PC**
2600 West Olive Avenue, Suite 500
Burbank, CA 91505
Tel: (310) 474-9111
twolfson@ahdootwolfson.com

## **WORD COUNT CERTIFICATION**

I hereby certify that the foregoing brief complies with the word count limitation set forth in Local Civil Rule 7.1(c) of the Southern District of New York. The brief contains 6,824 words, excluding the caption, table of contents, table of authorities, signature block, and any certificate of compliance. This count was determined by the word-processing system used to prepare this document.

Dated: September 18, 2025

Respectfully submitted,

/s/ Carter E. Greenbaum
Carter E. Greenbaum